**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| AG NUBIO, INC and BIOAGRO, S.A., Plaintiffs, v. VIVID LIFE SCIENCES, LLC; GENMAX LLC; JOSHUA R. KRENZ; and TIDAL VISION PRODUCTS, INC., Defendants. | Case No.: 0:25-cv-03585-JWB-LIB<br>**FIRST AMENDED COMPLAINT**<br>**Jury Trial Demanded** |

Plaintiffs Ag NuBio, Inc. ("AGBio") and Bioagro S.A. ("BioAgro") (collectively, "Plaintiffs"), by and through their undersigned attorneys and for their causes of action against Defendants Vivid Life Sciences, LLC ("Vivid"), GenMax LLC, Joshua R. Krenz ("Krenz"), and Tidal Vision Products, Inc. d/b/a Tidal Grow AgriScience ("Tidal Vision") (collectively, "Defendants"), allege and state as follows:

## INTRODUCTION

1. This action concerns Defendants' theft and exploitation of confidential information and proprietary trade secrets belonging to AGBio, Defendants' false and misleading statements concerning AGBio's products and Defendants' knockoff version thereof, and the harm caused to Plaintiffs thereby.

2. Among other improper actions, Vivid—who was AGBio's former nationwide distributor of a biopesticide registered with the Environmental Protection Agency ("EPA") as NuPro™—and Krenz (Vivid's principal) misappropriated at least the

use of the NuPro™ formula, manufacturing processes, confidential component suppliers, and research and development data to improperly obtain a '*me-too*' registration of a deceptive knock-off product with the EPA (*i.e.*, "GenMax"), transferred ownership rights to the knock-off product to GenMax LLC—an entity controlled by Krenz—and then sold the rights to the substantially similar knockoff product to Tidal Vision under circumstances in which Tidal Vision either knew or should have known of the derivative nature of the knock-off product, as well as AGBio's rights to ownership of that product via a vesting clause in a non-disclosure agreement to which Vivid was legally bound. Tidal Vision is now selling the knock-off product to would-be NuPro™ customers, thereby depriving Plaintiffs of market share and profits that they would otherwise enjoy if not for Vivid's, Krenz's, Tidal's, and GenMax LLC's improper conduct.

3. This action targets Defendants' violations of both federal and state statutes prohibiting the misappropriation of Plaintiffs' trade secrets, their violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), their breaches of contract, and their commission of other tortious misconduct.

## PARTIES, JURISDICTION, AND VENUE

4. Plaintiff AGBio's current principal place of business is in Miami, Florida, and it is duly formed and existing under the laws of the State of Delaware.

5. Plaintiff BioAgro is duly formed and existing under the laws of Chile, and has a principal place of business in Maipo, Chile.

6. Defendant Vivid is a Florida limited liability company organized on March 30, 2015, with its principal place of business in Princeton, Minnesota. It has appeared by and through counsel in this action.

7. Defendant GenMax LLC is a Minnesota limited liability company organized on November 5, 2019 whose registration was administratively terminated on February 28, 2024. It has appeared by and through counsel in this action.

8. Defendant Krenz is a Minnesota resident who has appeared by and through counsel in this action. He is also a member and co-founder of Vivid, and the Manager and Registered Agent of GenMax LLC.

9. Defendant Tidal Vision is a Delaware corporation with its principal place of business in Bellingham, Washington. It has appeared by and through counsel in this action.

10. The causes of action in this Complaint arise under the trade secret laws of the United States, 18 U.S.C. § 1836, *et seq.*, the Minnesota Uniform Trade Secrets Act, § 325C.01, *et seq.*, the Lanham Act, 15 U.S.C. § 1125(a)(1), the Minnesota Uniform Deceptive Practices Act, Minn. Stat. § 325D.44, and Minnesota common law.

11. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1836(c) and 15 U.S.C. § 1121(a) because AGBio asserts federal claims under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1832-1839 (the "DTSA") and the Lanham Act, 15 U.S.C. § 1051, *et seq.*, while BioAgro asserts federal claims under the Lanham Act. The Court also has supplemental or pendant jurisdiction over Plaintiffs' remaining claims against Defendants, pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal question claims.

12. Defendants Krenz, Vivid, and GenMax LLC are subject to general personal jurisdiction in this Court, in that they are residents/citizens of the State of Minnesota, were organized and/or have their principal place(s) of business in this state.

13. Defendant Tidal Vision is subject to specific personal jurisdiction in this Court, in that it purposefully directed activities at Minnesota by seeking out and acquiring Minnesota-based GenMax LLC's assets, contracting with Minnesota residents in connection with that acquisition, misappropriated AGBio's trade secrets in this State, and has sought to capitalize on its and the other defendants' misappropriation of AGBio's trade secrets and confidential information in this State. Plaintiffs' claims arise from and relate to those contacts.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district; or, alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because each of the Defendants is subject to the Court's personal jurisdiction with respect to the claims in this action.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A. AGBio's Business and Trade Secrets

15. AGBio is a technology-based specialty agricultural product company focused on hard-to-develop "low-dose" seed treatments and bio-pesticides. Such low-dosage (*i.e.*, earth-friendly) enhanced technology is highly sought after because it naturally increases crop production by inducing the defense systems of crops to better protect themselves against fungi, bacteria, and viruses, thereby naturally producing larger volumes

of higher quality fruits and vegetables. In addition to its eco-friendly characteristics, the technology is up to *90 times* more efficient than prior art approaches. Among the AGBio products that utilize this proprietary technology is NuPro™.

16. BioAgro is a related company to AGBio in that the companies share the same corporate parent. Pursuant to an agreement with AGBio, BioAgro exclusively manufactures NuPro™ for AGBio.

17. Plaintiffs have devoted and continue to devote extensive time, money, and other resources to the research, purchase, and development of the low-dose crop-enhancing products that they manufacture and sell including, but not limited to, the development of specialized manufacturing processes, product formulations, and associated data to build their reputation and company value.

18. The product formulations, manufacturing processes, and research and development data for NuPro™ are not generally known, and Plaintiffs take steps reasonable under the circumstances to maintain the secrecy of such information. Such product formulations, manufacturing processes, and research and development data are collectively referred to herein as the "Trade Secrets."

19. Among other precautions, AGBio maintains a company policy that highly restricts access to the company's confidential trade secret information to only a few individuals in the world. It further requires contractors and employees to execute non-disclosure agreements in those instances where disclosure is necessary. When it otherwise contracts with third parties who may have access to the Trade Secrets, it includes strict confidentiality provisions in such agreements. AGBio further restricts the manufacturing

of NuPro™ to only BioAgro, wherein only one scientist has access to the NuPro™ formula and its manufacturing process and maintains them under secure conditions, including a secure safe. Moreover, when Plaintiffs recently learned that the Trade Secrets and their other confidential information had been compromised, they brought suit to enforce their rights.

20. Plaintiffs take such precautions to maintain the secrecy of both the Trade Secrets and other confidential information because disclosure to competitors would result in irreparable, competitive harm.

**B. AGBio's Acquisition of the NuPro™ Trade Secrets**

21. AGBio first acquired the rights to the technology underlying NuPro™ via a June 2015, Trade Secret and Patent Rights Agreement ("Agreement") by and between AGBio (as buyer) and the then-owners of certain trade secret technology used in low-dosage chitosan-based seed treatments, its commercial application and EPA registration as "Yea! Seed Treatment," and certain related patents.

22. AGBio paid hundreds of thousands of dollars for the transfer of rights under the Agreement, in addition to certain representations and warranties from the former owners that, among other things, the confidentiality of the trade secret technology had been maintained, a 10-year agreement that the former owners (and those associated with them) would not sell competing products, and an agreement that the trade secrets covered by the Agreement would be maintained in strict confidence.

23. After the transfer, AGBio (through its agents) re-registered the Yea! Seed Treatment label with the EPA as NuPro™, and on February 29, 2016, AGBio began selling low-dose chitosan products using the NuPro™ Trade Secrets.

24. In registering NuPro™, AGBio's product formula and research and development data (including toxicology studies) that were submitted to the EPA were marked as confidential business information and/or trade secrets.

## C. Defendants' Misappropriation of AGBio's Trade Secrets and Unauthorized Use of Other Confidential Information

### (a) Defendants' Theft of the Trade Secrets and Creation of an Unauthorized Knock-Off Product

25. While employed by Land O'Lakes Inc. as the marketing manager for Winfield Solutions in 2013-2014, Defendant Krenz became aware of, and particularly interested in, low-dose chitosan products sold by AGBio and BioAgro.

26. Krenz ultimately left his employment with Land O' Lakes to co-found Vivid with others, including Mike Dobbins and John Gorman, owners of an Australian agricultural product supplier, Liquid Fertiliser Pty Ltd (a/k/a "Agrichem" or "Agrichem Australia"). Starting in the year it was formed, Vivid's website publicly stated that "Vivid Life Sciences continues to leverage the expertise…from their ***sister company, Agrichem***…" (emphasis added). *See* **Exhibit A**.

27. Upon information and belief, Vivid was a member-managed limited liability company under Florida law. Alternatively, Vivid was managed by a board of managers, each of whom had actual and apparent authority to act on behalf of Vivid.

28. Vivid marketed itself as a distributor of agricultural products to retailers, including distributing products from its sister company, Agrichem.

29. With Vivid, Krenz began actively seeking a business relationship with AGBio through AGBio's former president—Jerry Duff ("Duff"). Krenz's business relationship with Duff and Duff's agricultural consulting company, AgriThority, LLC ("AgriThority") had existed since 2006.

30. Krenz actively marketed himself and Vivid to Plaintiffs as a potential distributor of NuPro™. In the latter half of 2016, Krenz arranged for Mike Dobbins, Vivid's co-founder, member/manager, and senior board member (and director of its sister company), to visit the Chilean manufacturing facilities of BioAgro, at which NuPro™ was produced. Through several emails, Krenz confirmed that Dobbins was being sent to Chile in his capacity as Vivid's authorized agent to negotiate an agreement between Vivid and Plaintiffs:

> Thank you for the…opportunity to evaluate a working relationship together. As we discussed, Mike [Dobbins] and I will discuss this opportunity with our Board. Mike [Dobbins] and I will also look at calendars and see if I can join during his [Mike's] trip to Chile, or if we can find another place/time to reconvene.
>
> *Krenz email to Paul Abogabir, copying Mike Dobbins, dated Sept. 9, 2016*
>
> Mike [Dobbins] and I have begun discussions on a working [Vivid and AGBio] relationship.
>
> *Krenz email to AGBio dated Sept. 13, 2016*
>
> Mike [Dobbins] and I are meeting this week in the USA to discuss your proposal to work together. We will be discussing it with our Board next week

> as well. Mike [Dobbins] will be prepared to have a further conversation on this subject and share some of our thoughts when he comes to Chile to visit.
>
> *Krenz email to Paul Abogabir, copying Mike Dobbins, dated Nov. 4, 2016*
>
> Mike [Dobbins] and I have had a good week together in the USA visiting with companies. Make sure he has a good time in Chile, since I've been busting his ass working here! As Mike and our Board have been talking about the opportunity for both companies to work together, we put together the attached thoughts [in a "Confidential Business Proposal" between Vivid and Plaintiffs]. These are just thought starters for your time with Mike in 2 weeks. **You don't need to respond to these... Mike will talk through th[ese] ideas and any others ideas/thoughts you have when he visits"** (emphasis added).
>
> *Krenz email to Ramon Salinas, copying Mike Dobbins, dated 11/11/2016*

31. In preparation for Dobbins' business visit and in furtherance of the expected working relationship between Vivid and AGBio, a "Non-Disclosure Agreement" (the "NDA") was executed by and between BioAgro—"on its own behalf and on behalf of AgNubio, Inc."—and Liquid Fertiliser Pty Ltd., "(in this agreement called Agrichem), on its own behalf of **all associated and related companies…**" (collectively, the "Recipient") (emphasis added).

32. Vivid was, in effect, the North American "associated" and "related" arm of Agrichem/Liquid Fertiliser Pty. Ltd. ("Agrichem"). Though styled as a separate company, Vivid was repeatedly described by its principals as Agrichem's "sister company" and functioned as such.

33. Agrichem's beneficial owners, Mike Dobbins and John Gorman, held joint controlling interests in *both* Vivid and Agrichem, confirming Vivid's status as a sister/related company[1] and an associated entity[2] to Agrichem.

34. Dobbins and Gorman also co-founded Vivid (with others), were members and served on Vivid's Board of Directors (and/or Board of Managers). Thus, Dobbins held managerial roles in both Vivid and Agrichem.

35. As noted earlier, Dobbins, acting as Vivid's representative, traveled to Chile to negotiate Vivid's "Confidential Business Proposal" with Plaintiffs and *separately* from his role in Agrichem. Agrichem´s name was *never* mentioned in Vivid's Confidential Business Proposal (to be negotiated by Dobbins).

36. Vivid's own public statements and press releases further confirmed Vivid's associated/related status to Agrichem, announcing that Vivid had secured exclusive rights to Agrichem's technology and products across the United States and Canada. Vivid subsequently went on to represent and sell Agrichem's products into the North American market.

37. Vivid's officers and executives regularly described Agrichem as its "sister company" in official communications and in their own public-facing LinkedIn profiles.

---

[1] "A sister corporation is '[o]ne of two or more corporations controlled by the same, or substantially the same, owners.'" Black's Law Dictionary (11th ed. 2019)).

[2] Under Australian law (the NDA contains an Australian choice of law provision), entities are considered "associated" if, *inter alia*, they are controlled by the same person(s) or if there is substantial common ownership or control. *See* Corporations Act of 2001 (Cth) § 50AAA (Australian law).

Moreover, Agrichem acted at the direction of Krenz and Vivid in the sale of its products in North America.

38. Additionally, Liquid Fertiliser Pty Ltd (operating as Agrichem) is the registered owner of the Vivid trademark, logo, and brand name with the Australian intellectual property authority.

39. In short, Vivid and Agrichem shared overlapping controlling ownership, overlapping management, and company assets—including company names, logos, and product lines.

40. Given that the NDA defined "Agrichem"/Liquid Fertiliser Pty Ltd. to include all associated and related companies—of which Vivid was one—Vivid became legally bound by the NDA's provisions. Moreover, Vivid presented Mike Dobbins as its authorized representative in dealings with Plaintiffs, including for purposes of executing the NDA. Dobbins possessed both actual authority and apparent authority to bind Vivid to the NDA as detailed herein.

41. Similarly, BioAgro and AgBio were collectively defined by the NDA as the named party "BioAgro."

42. In September 2016, Mike Dobbins executed the NDA.

43. Relying on the NDA, AGBio, just days after signing it, fulfilled Vivid and Krenz's pending request for information covered by the NDA by providing them with highly confidential company information, including AGBio's U.S. customer list and financial data.

44. The NDA protected, among other things, "all information, documentation, materials, ideas, trade secrets, . . . formulations, manufacturing techniques and process, sales and marketing information,. . . trials, [and] research and development data" disclosed to Agrichem and/or Vivid. Moreover, the NDA provided that any alterations made by the Recipient that relate to the Plaintiffs' confidential intellectual property would *automatically* vest in BioAgro or AGBio, as the case may be:

> **INTELLECTUAL PROPERTY**
>
> 5.0 **THE RECIPIENT** acknowledges that all intellectual property, industrial property and proprietary rights (of any kind throughout the world, whether registered or unregistered and whether existing now or in the future) in or relating to the Confidential Information, including improvements, additions or creations made by **THE RECIPIENT**, will vest in and belong to Bioagro S.A. absolutely. **THE RECIPIENT** will have no right, claim or interest in any registered or unregistered intellectual property owned by **Bioagro S.A**.

45. A true and correct copy of the NDA is attached hereto as **Exhibit B**.

46. In January 2017, Krenz traveled to BioAgro's facilities in Chile so that Krenz could learn more about AGBio's products and to foster business relationships with AGBio and BioAgro. During that visit, Krenz received a tour of the manufacturing facilities in which NuPro™ was manufactured.

47. Following Dobbins' November 2016 trip and Krenz's January 2017 trip to Chile, Defendant Vivid entered into a Letter of Intent with AGBio, dated March 27, 2017, pursuant to which the parties agreed that Vivid would be the exclusive distributor for NuPro™ (which was to be manufactured by BioAgro in Chile) for at least a one-year period

beginning April 1, 2017, while the parties negotiated a "long-term sale and distribution contract."

48. During the negotiations leading up to the Letter of Intent and after, Krenz *aggressively* sought an ownership interest in AGBio for himself and/or Vivid as part of any proposed distributorship deal with AGBio. AGBio's principals ultimately refused to include equity ownership in any deal with Krenz and Vivid.

49. Vivid acted as the distributor for NuPro™ in the United States through the term of the Letter of Intent and for some time afterward. AGBio ultimately severed the relationship in early 2019 after a billing dispute with Vivid. BioAgro continued to manufacture NuPro™ both during the term of the Letter of Intent and afterward, continuing to the present.

50. At no time during the business relationship between Plaintiffs and Defendants Krenz/Vivid did Plaintiffs authorize disclosure to Krenz or Vivid of the Trade Secrets used to manufacture NuPro™. As merely a distributor (not manufacturer) of AGBio's products, there was no need to disclose the Trade Secrets to Krenz or Vivid.

51. Under the parties' NDA, Vivid had no right to separately exploit AGBio's Trade Secrets and other intellectual property.

52. Unbeknownst to Plaintiffs, Defendant Krenz (on his own behalf and for Vivid) hatched a plan to steal AGBio's customers and potential customers, register an unauthorized knock-off of NuPro™ with the EPA using AGBio's Trade Secrets/IP, and to profit from Plaintiffs' significant investments of capital, time and expertise.

53. First, Krenz developed the product name "USAG2020" and the alternative brand name "GenMax." Then, utilizing AGBio's confidential customer list and without authorization, Krenz and Vivid began systematically marketing GenMax to Plaintiffs' NuPro™ customers as a replacement for NuPro™ without permission from or notice to AGBio.

54. Further, Vivid (at Krenz's direction) began taking existing inventory of NuPro™, rebottling it into other containers, adhering a newly created GenMax label on it, and selling its misbranded pesticide to customers without permission from AGBio. The unauthorized GenMax label was a virtual knock-off of the NuPro™ label, but with the name changed (and omitting the EPA-registered name as required by federal law).

55. Vivid's internal and outside email correspondence with NuPro™ customers revealed this marketing strategy and its implementation with Plaintiffs' then-existing NuPro™ customers. Just a few examples of such correspondence include:

**Subject:** Meeting Follow Up

"Bob,

Thanks again for the time with Josh and I yesterday. . . . I was excited to see the results of your corn overtreatment results with Nutriseed and **GENMAX(NuPro)**."

*-Vivid VP Aaron Locker email to NuPro™ customer Sunrise Cooperative dated 9/25/2019 (bolding added)*

* * * * * * * * *

**Subject:** GENMAX Label

"This is the new name for NuPro."

-*Vivid VP Aaron Locker email to Vivid sales staff dated 9/27/2019*

* * * * * * * * *

**Subject:** Retail Price List

"Note – NuPro is now GenMax."

-*Krenz email to Vivid sales staff dated 10/16/2019*

* * * * * * * * *

**Subject:** Re: Label: NuPro vs GenMax

"Hi, Jodi:

Attached is the label and SDS for GenMax. This product has replaced NuPro (same product, new name)."

-*Krenz email to NuPro™ customer Sunrise Cooperative dated 1/21/2020*

56. Thus, Vivid's interference with AGBio was a *direct diversion of existing NuPro™ customers*.

57. At no time did Plaintiffs authorize the rebottling of NuPro™. In fact, such rebottling of NuPro™ was against the prior direct instruction of Plaintiffs to *not* open existing bottles of NuPro™ and repack it into other containers. The opening of existing containers of NuPro™ exposed the product to oxygen and contaminants prior to the rebottling, thereby degrading the product and providing reduced protection against soil pests and pathogens—and endangering crops to which the degraded product was to be applied.

58. After being directly told by AgBio that NuPro™ could not be opened and rebottled, Vivid—acting through Krenz—nevertheless sought EPA approval for a "100%

repack" (rebottling) registration *without* disclosing its intentions to Plaintiffs. In a further act of deception, Vivid and Krenz withheld from the EPA the critical fact that their proposed rebottling would contravene the manufacturer's prohibition, thereby engaging in reckless and misleading conduct designed to misbrand NuPro™ and mislead U.S. federal regulators.

59. Upon information and belief, Defendants Krenz and Vivid intentionally concealed their actions from Plaintiffs, fully aware that their conduct constituted theft of intellectual property and a breach of the parties' NDA. Additionally, Krenz and Vivid likely knew that selling a degraded pesticide, which failed to meet the performance data filed with the EPA, was unlawful. Such willful and reckless actions jeopardized Plaintiffs' investments and goodwill in the NuPro™ product.

60. Second, unbeknownst to AGBio and without its authorization, Vivid hired AGBio's governmental registration agent ("EPA Agent"), SmithBosarge LLC ("SmithBosarge"), to assist it with registering a competing, unauthorized knock-off product with the EPA. As AGBio's EPA Agent, SmithBosarge had full access to the EPA file for NuPro™.

61. Notably, SmithBosarge (and in particular, Leanna Bosarge) had originally been recommended by Krenz to AGBio when AGBio was looking for assistance with finding an EPA Agent to assist it with both federal and state-level registrations of NuPro™. Krenz and Ms. Bosarge had a prior working relationship going back to Krenz's employment with Winfield Solutions.

62. In assisting what was to be a direct competitor of AGBio and utilizing and specifically coopting AGBio's Trade Secrets to do so, SmithBosarge violated a duty of loyalty and confidentiality owed to AGBio under principles of agency.

63. On September 9, 2019, with SmithBosarge's assistance, Vivid obtained the registration of its knock-off product with the EPA, initially named "USAG2020," by exclusively referencing the product formula underlying NuPro™ (the ¨Rebottling Registration¨). Upon information and belief, Krenz concealed from SmithBosarge that rebottling impaired quality and defied the manufacturer's instructions.

64. Vivid's registration of USAG2020 (later rebranded as "GenMax") thereby became Vivid's *only* EPA-registered product (both at the time and *ever*).

65. The EPA process instigated by Vivid incorporated by default AGBio's underlying technology, including, without limitation, ABGio's already approved Confidential Statement of Formula, confidential supplier list, confidential safety/toxicology data, and AGBio's confidential field trials to fast-track an otherwise lengthy EPA process. Vivid's unauthorized use of Plaintiffs' intellectual property violated the NDA as set forth below.

66. Shortly after Vivid obtained its unauthorized initial registration of USAG2020, it filed a notification of the alternative brand name "GenMax" (hereinafter GenMax/USAG2020 will be referred to as "GenMax").

67. Vivid improperly secured an EPA registration for GenMax by invoking the "Me-Too" fast-track process, which permits registration of products that are the same as or substantially similar to existing products like NuPro™. To achieve this, Vivid improperly

and without AGBio's consent misappropriated AGBio's Trade Secrets—*i.e.*, the NuPro™ product formula, toxicology studies, and field trials—to sidestep the cost and burden of producing their own and the EPA´s full Data Matrix report. In so doing, Vivid not only misappropriated AGBio's Trade Secrets, but it materially breached the NDA's non-use provisions, which expressly barred any unauthorized use of AGBio's confidential information or intellectual property.

68. Vivid thereafter submitted an amendment to its "me-too" EPA registration revising GenMax's formula. The original Confidential Statement of Formula ("CSF #1") had directly relied upon NuPro™'s formula (and other AGBio-owned technology). Vivid then filed a revised Confidential Statement of Formula ("CSF #2"), altering GenMax's formula but still preserving its "me-too" status with the EPA, meaning the modified GenMax product remained identical or substantially similar[3] to NuPro™ *after* the formula update. By operation of the NDA, any such "creations," "improvements," or "additions" to Plaintiffs' Confidential Information, including CSF #1 and CSF #2, vested absolutely in Plaintiffs.

69. In further support of Vivid's revised product formula (CSF #2) application, Vivid also submitted EPA Form 8570-35 (as required by EPA regulations) identifying and

[3] *See* 40 CFR § 152.43(a) (2019): "A product is eligible for registration under this subpart if it is identical or substantially similar in composition and use to one or more currently registered products. An identical or substantially similar product is one that contains the same active ingredient(s) in the same percentage(s), and … other material required to be submitted are the same or substantially similar to those of the currently registered product(s)."

using two confidential toxicology studies that AGBio had previously submitted to the EPA in support of the NuPro™ registration.

70. When submitting new or updated product formulas, federal regulations provided that the citation of studies or data previously submitted by another registrant required both that (a) the applicant offer to pay compensation to the original registrant for the citation of its studies, and (b) the applicant certify to the EPA that it had done so. *See* 40 C.F.R. § 152.86.

71. Pursuant to 40 C.F.R. § 152.93, Vivid submitted a Certified Declaration (EPA Form 8570-34), attesting under penalty of perjury to the Environmental Protection Agency that it had made a good-faith offer to license or compensate data submitters (AGBio in this case) for data supporting the GenMax pesticide registration, and that Vivid maintained evidence of delivery of the offer to compensate AGBio.

72. In July 2020—before Vivid's unauthorized amendment had been approved by the EPA—it submitted a revised EPA Form 8570-35 again citing AGBio's two confidential toxicology studies (and adding an AGBio confidential component supplier). Vivid filed a second Certified Declaration stating that it had made a compensation offer to AGBio.

73. *Contrary* to Vivid's multiple Certified Declarations, Vivid *never* submitted any offer to AGBio to pay compensation for its citation of AGBio's toxicology studies in support of Vivid's application for amendment of the GenMax product formula.

74. In fact, AGBio had no knowledge whatsoever that Vivid had registered GenMax or that Vivid had relied on AGBio's toxicology studies and use in support of Vivid's amended registration.

75. More specifically, at no time did AGBio authorize Vivid's use of AGBio's intellectual property, including use of its formula, toxicology studies, field trials, or confidential suppliers for its knock-off product.

76. Furthermore, upon information and belief, Vivid and Krenz conspired with Duff and AgriThority to obtain a confidential product presentation that had been prepared by Plaintiffs and that discussed details of the low-dose nature of AGBio's NuPro™ product. Vivid then utilized such information in working with a product formulator to develop the amended product formula for GenMax.

77. Upon information and belief, Vivid and Krenz also began utilizing, without authorization, field trials of NuPro™ that had been conducted on various crops (and for which Plaintiffs had paid) to market and sell GenMax to then-current, new and former NuPro™ customers. Such field trial results were also deemed "Confidential Information" under the NDA.

78. Under the NDA, each of Vivid's unauthorized uses "in or relating to the Confidential Information" *automatically* transferred ownership of GenMax, including all related EPA registrations, to Plaintiffs.

79. Federal regulations further required that Vivid use an EPA-registered primary name of the product (NuPro™ or USAG2020) on its product labels and in marketing. Instead, Vivid used *only* the alternate brand name "GenMax," resulting in (a)

the misbranding of what was, in fact, AGBio's NuPro™ product, and (b) the unlawful distribution of a misbranded pesticide product, resulting in Plaintiffs' loss of customers, loss of market share, and lost profits. Upon information and belief, Vivid and Krenz engaged in these reckless and unlawful activities to conceal their theft from Plaintiffs (e.g., the "GenMax" name was not initially publicly searchable on the EPA website, unlike the NuPro™ or USAG2020 registered names that Vivid was required—*yet failed*—to include under federal law).

80. Moreover, by failing to include the NuPro™ name on their unauthorized rebottled pesticide product, Vivid and Krenz deceived customers regarding the product's actual source, thereby violating the Lanham Act.

81. Thus, in summarized form, Vivid and Krenz:

(a) Misappropriated NuPro™'s product formula, manufacturing processes, and *all* of the research and development data AGBio submitted in support of its EPA registration when seeking their own "repack" registration of USAG2020 in contravention of NuPro's manufacturing guidelines, that they then used (a) to deceptively market and sell already-existing NuPro™ under that new registration, and (b) as an anchor for later amendments to the USAG2020 registration;

(b) Separately breached the NDA by coopting such information to their own use and benefit, without authorization;

(c) Again, misappropriated two of NuPro™'s toxicology studies in connection with Vivid's amendment of its USAG2020 registration when expressly relying on such studies without authorization or compensation;

(d) Separately breached the NDA by utilizing such toxicology studies;

(e) Misappropriated the Rebottled Registration and the amended GenMax formula that, because it was "in or relating to [] Confidential Information" as described in the NDA (*i.e.*, substantially identical to the NuPro™ formula upon which its registration was expressly derived), was *automatically* transferred to Plaintiffs' ownership by virtue of the NDA's vesting provision;

(f) Separately breached the NDA by (i) holding GenMax out as their own, and (ii) utilizing Plaintiffs' customer lists, confidential supplier lists, and field trial results to market and sell GenMax to Plaintiffs' NuPro™ customers;

(g) Engaged in false and misleading advertising and sales to Plaintiffs' NuPro™ customers by passing off rebottled (and therefore defective) NuPro™ as GenMax, and stating (in various formulations) that GenMax was "the new NuPro™"; and

(h) Intentionally and tortiously interfered with Plaintiff's ongoing customer relationships through use of such deceptive and illegal conduct.

82. In November 2019, Krenz organized GenMax LLC under Minnesota law and transferred thereto any rights Vivid held in the GenMax product.

83. Vivid's deceptive rebranding, failure to notify AGBio of the GenMax registration, failure to offer to pay compensation for use of AGBio's Confidential Information and Trade Secrets, unauthorized use of the EPA's "100% repack" registration process, and setting up a sham entity to transfer the rights to GenMax were all calculated to hide Defendants' actions from Plaintiffs (including theft of AGBio's intellectual property), confuse purchasers, avoid the NDA, divert Plaintiffs' customer base to themselves, and steal Plaintiffs' substantial investment and goodwill in NuPro™.

**(b) Tidal Vision's Quest for and Acquisition of AGBio's Stolen Trade Secrets and Confidential Information**

84. Tidal Vision is a company that, until 2021, created products incorporating chitosan for use in the areas of water treatment and textiles (*i.e.*, no chitosan-based agriculture products).

85. Tidal Vision sought a working relationship with Plaintiffs at least as early as 2018.

86. Tidal Vision intentionally targeted AgBio and, upon information and belief, undertook a calculated campaign to obtain the NuPro™ technology by any means available.

87. On or about October 27, 2021, representatives of Tidal Vision met with AgriThority in Kansas City, Missouri, to have a "preliminary strategic planning session"

regarding Tidal Vision's desire to move beyond its focus on water treatment and textiles to the use of chitosans in the agriculture industry.

88. In mid-December 2021, Tidal Vision and AgriThority executed a "Master Agreement for Tidal Vision," whereby Tidal Vision hired AgriThority to, *inter alia*, (a) complete a market analysis directed toward increasing Tidal Vision's product lines to include "a diversity of molecule sizes and resulting agricultural products," (b) advise Tidal Vision on "manufacturing and formulation selection," (c) introduce Tidal Vision to third parties that could further its goals, and (d) "[p]rovide regulatory support and review to obtain an USA EPA approved chitosan label through acquisition or post exclusive use expiration."

89. Indeed, the master contract between Tidal Vision and AgriThority expressly stated that "[s]eed treatment was determined to be one of the most exciting areas with the most potential" (Plaintiffs´ NuPro™ product is a seed treatment) and that "Tidal Vision wants access to AgriThority Intellectual Knowledge of *chitosans*" (emphasis added) and related chitosan "manufacturing and formulation selection." (Plaintiffs' NuPro™ product is *chitosan*-based).

90. In furtherance of AgriThority's contractual relationship with Tidal Vision, Duff inquired in late-2021 of AGBio's foreign shareholders regarding interest in a potential sale or merger of AGBio with an unnamed private-equity client of AgriThority, and Duff suggested a meeting with the president of the unnamed company to discuss the possibility.

91. Then, in February 2022, Duff again suggested a meeting with the private equity client, who Duff then identified as Tidal Vision, and its President, Kevin Hammill.

92. In mid-March 2022, Mr. Hammill of Tidal Vision and representatives of AGBio met to discuss AGBio's proprietary trade secret chitosan products. In a follow-up email, Mr. Hammill indicated his belief that "chitosan is one of the most unexploited biomolecules in the world," and suggested that the parties "further discuss[] opportunities to work together to globally grow chitosan and complementary products."

93. AGBio was not interested in selling the company or its Trade Secrets to Tidal Vision as it was developing the next generation of NuPro™ products. Accordingly, AGBio simply responded that the matter could be discussed again "in a few years."

94. In early 2024, AGBio held discussions with Albaugh LLC ("Albaugh"), a crop solutions company, as part of ongoing NuPro™ pre-sales product testing spanning several years. During this meeting, Albaugh's representatives informed AGBio of a new product being marketed with the same characteristics as NuPro™, named "GenMax." Albaugh's representatives further informed AGBio that its client had purchased the knock-off version of NuPro™. Upon investigation, AGBio learned that Tidal Vision offered the product—which had the same features as NuPro™.

95. This came as a *complete surprise* to AGBio, as AGBio had authorized no such product and was unaware of Vivid's improper EPA registration of the knockoff GenMax product.

96. As AGBio later learned, Tidal Vision had acquired GenMax LLC's rights to GenMax in June 2022 via an asset purchase agreement between Tidal Vision as buyer, GenMax LLC and Krenz, in return for significant and ongoing compensation (in yet

another violation of the NDA). Tidal Vision is currently listed as the holder of the GenMax product registration with the EPA, which relied on proprietary and confidential information stolen from AGBio.

97. Upon information and belief, Tidal Vision, as well as Tidal Vision's outside investors, conducted separate and significant due diligence in connection with the acquisition of the GenMax product (and during subsequent Tidal Vision fundraising rounds), and either learned or should have learned of the theft and misuse of AGBio's Trade Secrets and Confidential Information, Vivid's misbranded sales of GenMax, the unauthorized knock-off nature of the GenMax product, and AGBio's proprietary interest in the technology, manufacturing processes, and research data underlying GenMax—including, without limitation, any improvements to the product made now or in the future, which vested and are rightfully owned by AGBio under the NDA.

98. Moreover, in March 2022, Tidal Vision entered into a consulting agreement with SmithBosarge, the same EPA Agent who had handled the registrations of NuPro™ and GenMax.

99. By recruiting AgBio's former president (Duff), former EPA coordinator (Agrithority), former EPA Agent (SmithBosarge), and acquiring GenMax, an identical or substantially similar knock-off product originally registered by AGBio's former national distributor as a "100% repack" (rebottle) of NuPro™, Tidal Vision knowingly, or at the very least recklessly, engaged in a course of conduct designed to profit from AGBio's proprietary technology and Confidential Information and Vivid's/Krenz's/GenMax LLC's misappropriation and unauthorized use thereof.

100. A 2024 published news article states that in 2023, Tidal Vision's[4] "products were used on more than 2.4 million acres of farmland [2023], and… expects that number to almost double for 2024." More recently, Tidal Vision stated in publicly filed documents that it expects GenMax to generate over $100 million in net profit over the next five years.

**COUNT I**
**VIOLATIONS OF THE DEFEND TRADE SECRETS ACT**
**18 U.S.C. § 1836**
**(AGBio Against All Defendants)**

101. AGBio incorporates by reference each of the foregoing paragraphs as if set forth in full herein.

102. AGBio owns, possesses, and has invested in certain nonpublic, confidential and proprietary information, which includes the formula, manufacturing processes, and research and development data used to create NuPro™ Low-Dosage Seed Treatments and the studies submitted to the EPA in connection with the NuPro™ (and its predecessor "Yea!") registration.

103. AGBio has made reasonable efforts and taken reasonable steps to keep the information secret, including but not limited to, severely limiting access to the company's confidential trade secret information. Its trade secrets related to NuPro™'s product formula, manufacturing processes, and research and development data (including toxicology studies and field trials) are maintained on an extremely limited need-to-know basis; by having signed agreements to maintain the confidentiality of the information; by

---

[4] *See* https://thetyee.ca/WhatWorks/2024/03/27/Crab-Shells-Wonder-Ingredient/# (last accessed June 5, 2024).

maintaining procedures to ensure the confidentiality of the information; by taking steps to determine whether breaches of the information occurred and respond accordingly; and by taking legal action where necessary to protect the information.

104. This confidential and proprietary information involves and relates to manufacturing and involves and relates to services used and intended to be used in interstate commerce.

105. This information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use of the information.

106. AGBio's NuPro™ product formula, manufacturing processes, and research and development data described herein constitute trade secrets within the meaning of the federal Defend Trade Secrets Act, *See* 18 U.S.C. § 1839.

107. AGBio did not expressly or impliedly authorize the disclosure of its Trade Secrets.

108. Defendants Krenz, Vivid, and GenMax, LLC engaged in willful and malicous misappropriation of AGBio's Trade Secrets via improper means, in that they (a) knowingly coopted and utilized the NuPro™ formula, manufacturing processes, and research and development data submissions without AGBio's written consent (and through SmithBosarge's breaches of duty to AGBio) and without compensation to register a competing, knock-off product utilizing theft and/or misrepresentation, and/or (b) used the NuPro™ formula, manufacturing processes, and research and development data submissions without express or implied consent and utilizing improper means.

109. Further, Tidal Vision acquired and used AGBio's Trade Secrets: (a) through acquisition of GenMax from GenMax LLC, despite knowing or having reason to know that the Trade Secrets upon which GenMax was registered had been acquired by improper means; (b) alternatively, via use of improper means itself, in that Tidal Vision induced SmithBosarge to breach its duty to maintain the secrecy of the Trade Secrets; (c) despite knowing or having reason to know that the Trade Secrets had been (i) derived from or through a person who had used improper means to acquire them, (ii) acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets or limit their use, or (iii) derived from or through persons/entities who owed a duty to AGBio to maintain the secrecy of the Trade Secrets or limit their use; or (d) despite knowing that the Trade Secrets were trade secrets, and knowledge thereof had been acquired by accident or mistake.

110. In violation of AGBio's rights, Defendants misappropriated and improperly used the Trade Secrets by improper means, including the product formula, manufacturing processes, and research and development data submissions used to create, register and distribute NuPro™ Low-Dosage Seed Treatments. Defendants' misappropriation of the trade secret information was intentional, knowing, willful, and malicious.

111. As the direct and proximate result of Defendants' conduct, AGBio has suffered and will continue to suffer injury and significant actual damages.

112. Defendants Krenz, Vivid, and GenMax, LLC have been enriched in the form of unauthorized use of the Trade Secrets, sales of the knock-off GenMax product, and

payment by Tidal Vision for the rights to the Trade Secrets and GenMax product line and EPA registration.

113. Further, Defendant Tidal Vision has been enriched in the form of unauthorized use of the Trade Secrets and sales of the knock-off GenMax product.

WHEREFORE, as a result of the foregoing, AGBio respectfully requests that the Court enter judgment in its favor and against Defendants, and each of them, on Count I, enter an award against them jointly and severally for actual damages, unjust enrichment damages, exemplary damages of up to the maximum amount permitted by law, attorneys' fees and costs, post-judgment interest, ex parte seizure and preservation measures authorized by 18 U.S.C. § 1836(b)(2) to prevent dissemination of trade secrets, injunctive relief prohibiting Defendants from further misappropriation of AGBio's Trade Secrets, and all such other relief to which the Court deems it justly entitled.

**COUNT II**
**VIOLATION OF THE MINNESOTA UNIFORM TRADE SECRETS ACT**
**MINN. STAT. § 325C.01 *et seq.***
**(Both Plaintiffs Against All Defendants)**

114. Plaintiffs incorporate by reference each of the foregoing paragraphs as if set forth in full herein.

115. As described herein, AGBio's formulas, manufacturing processes, and data submissions for its low-dose seed treatments constitute highly sensitive, confidential, and proprietary information that derive substantial, independent economic value, actual or potential, from not being generally known to, or ascertainable by proper means by, other persons who can obtain economic value from disclosure, such as Plaintiffs' competitors.

116. Also as described herein, Plaintiffs have invested substantial time and resources and made reasonable efforts to maintain the secrecy of such confidential and proprietary information.

117. As a result, AGBio's NuPro™ product formula, manufacturing processes, and research and development data described herein constitute "trade secrets" within the meaning of Minn. Stat. § 325C.01.

118. Each of AGBio and BioAgro benefit from and rely upon the maintenance of the confidentiality and exclusivity of the Trade Secrets. AGBio benefits directly from increased market share, a stable end-user customer base, increased customer goodwill, sales and profits. BioAgro benefits directly from increased and ongoing manufacturing of NuPro™ and profits derived therefrom.

119. Defendants Krenz, Vivid, and GenMax, LLC acquired and used AGBio's Trade Secrets via improper means, in that they (a) knowingly utilized the NuPro™ formula, manufacturing processes, and research and development data submissions (and through SmithBosarge's breaches of duty to AGBio) without AGBio's written consent and without compensation to register a competing, knock-off product utilizing theft and/or misrepresentation, and/or (b) used the NuPro™ formula, manufacturing processes, and data submissions without express or implied consent and utilizing improper means.

120. Further, Tidal Vision acquired and used AGBio's Trade Secrets: (a) through acquisition of the Trade Secrets from GenMax, LLC despite knowing or having reason to know that the Trade Secrets had been acquired by improper means; (b) alternatively, via use of improper means itself, in that Tidal Vision induced SmithBosarge to breach its duty

to maintain the secrecy of the Trade Secrets; (c) despite knowing or having reason to know that the Trade Secrets had been (i) derived from or through a person who had used improper means to acquire them, (ii) acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets or limit their use, or (iii) derived from or through persons/entities who owed a duty to AGBio to maintain the secrecy of the Trade Secrets or limit their use; or (d) despite knowing that the Trade Secrets were trade secrets, and knowledge thereof has been acquired by accident or mistake.

121. Defendants' misappropriation and ongoing use of AGBio's Confidential Information and Trade Secrets require Defendants to return to AGBio all materials constituting, reflecting, or embodying any such trade secrets.

122. As described herein, Defendants' misappropriations and ongoing use of the Confidential Information and Trade Secrets described herein is and was willful, malicious, and in deliberate disregard for the rights or safety of others.

123. As a direct and proximate result of Defendants' actions as described herein, Plaintiffs have sustained injury in the form of lost customers, lost market share, lost opportunity, and lost profits, and they continue to suffer such actual damages.

124. Defendants Krenz, Vivid, and GenMax, LLC have been enriched in the form of unauthorized use of the Trade Secrets, sales of the knock-off GenMax product, and payment by Tidal Vision for the rights to the Trade Secrets and GenMax product line and EPA registration.

125. Further, Defendant Tidal Vision has been enriched in the form of unauthorized use of the Trade Secrets and sales of the knock-off GenMax product.

WHEREFORE, as a result of the foregoing, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and each of them, on Count II, enter an award against them jointly and severally for actual damages, unjust enrichment damages, exemplary damages of up to the maximum amount permitted by law, attorneys' fees and costs, post-judgment interest, injunctive relief prohibiting Defendants from further misappropriation of AGBio's Trade Secrets, and all such other relief to which the Court deems them justly entitled.

**COUNT III**
**BREACH OF CONTRACT AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201-2202**
**(<u>Both Plaintiffs Against Vivid, GenMax, LLC and Tidal Vision</u>)**

126. Plaintiffs incorporate by reference each of the foregoing paragraphs as if set forth in full herein.

127. The NDA is a valid and enforceable contract.

128. The NDA defines "BioAgro" to include both BioAgro and AGBio, and as such, both are parties to the NDA.

129. Alternatively, AGBio is an intended third-party beneficiary of the NDA.

130. Either as a party or as an intended third-party beneficiary of the NDA, AGBio has the right to enforce the terms of the NDA. Where "Bioagro S.A." is used in the NDA, it incorporates "AgNubio, Inc." and provides AGBio all the same rights as BioAgro.

131. Plaintiffs performed all material terms of the NDA.

132. Vivid is/was an "associated" and/or "related" company to AgriChem, as described by the NDA, and is bound by the NDA's terms either as a named or otherwise

identified party, as a disclosed principal, under principles of estoppel and/or under principles of agency. In particular, Mike Dobbins had both actual and apparent authority to bind Vivid to the terms of the NDA, in that at the time the NDA was executed: (a) Dobbins was a co-founder, member and or manager and a senior board member of Vivid; (b) Dobbins was held out by Krenz as an agent of Vivid for purposes of discussions with AGBio concerning a business relationship, including Dobbins' visit to Chile, and the terms of any contractual relationship between AGBio and Vivid; (c) in online profiles, Krenz regularly described Agrichem (which Dobbins co-owned) as its "sister company"; (d) Agrichem's two owners (Mike Dobbins and John Gorman) were co-owners holding a majority interest in Vivid and were Board members of Vivid; (e) Vivid has held Agrichem out to others as a related company to Vivid; and (f) in 2015, Vivid acquired Agrichem's assets in the United States and Canada.

133. Under the terms of the NDA, Vivid had, *inter alia*, an obligation to keep "[a]ny Confidential Information disclosed, revealed or otherwise known by [Vivid], whether before or after the date of this agreement, . . . strictly confidential." "Confidential information" was defined to include "all information, documentation, materials, ideas, trade secrets, concepts, know-how, dealings, formulations, manufacturing techniques and processes, sales and marketing information, pricing and costings, trials, research and development data, systems and technical, commercial, financial or legal information relating to Bioagro S.A or to Bioagro S.A businesses or technology, and all information necessary for the normal operations and profitability of Bioagro S.A or Bioagro S.A's businesses." *See* Exh. B at §§ 1.1 and 1.2.

134. The Trade Secrets, customer lists, component suppliers, and other confidential and proprietary information were all within the scope of "Confidential Information" described in the NDA.

135. Vivid was prohibited from, *inter alia*, "us[ing] Confidential Information for any purpose other than in performing [its] obligations or duties to BioAgro [and/or AGBio] without first obtaining prior written consent." Exh. B at § 1.4.

136. Vivid's obligations under the NDA were to "subsist for an indefinite period of time and [its] obligations under this agreement [were] continuing." Exh. B at § 3.0.

137. As described above, Vivid breached the NDA by using the Confidential Information, which was within the scope of the NDA, to register, sell, and file amendments to the USAG2020 registration, and then sell ownership rights to the registration, *without* first obtaining Plaintiffs' prior written consent.

138. Vivid also breached the NDA by utilizing the Confidential Information to market and sell GenMax to Plaintiffs' NuPro™ customers, destroy Plaintiffs' customer goodwill, and steal market share.

139. The NDA also provided that "all intellectual property, industrial property and proprietary rights (of any kind throughout the world, whether registered or unregistered and whether existing now or in the future) in or relating to the Confidential Information, **including improvements, additions or creations** made by the RECIPIENT, **will vest in and belong to Bioagro S.A. absolutely**. The RECIPIENT will have no right, claim or interest in any registered or unregistered intellectual property owned by Bioagro S.A." *See* Exh. B at § 5.0 (bolding added).

140. GenMax LLC acquired all of Vivid's rights, title, and obligations to USAG2020/GenMax and its product registration, and upon information and belief, assumed all of Vivid's contractual obligations in connection therewith; or in the alternative, operated as an alter ego of Vivid. As such, it is likewise bound by the terms of the NDA with respect to the use of the Confidential Information and the automatic vesting of any intellectual property and property rights in Plaintiffs of any improvements, additions or creations relating to the Confidential Information.

141. Alternatively, as an entity specifically organized, owned and managed by Krenz to hold the rights to GenMax, GenMax LLC was also an "associated" and/or "related" company to Agrichem and Vivid, and therefore was and is bound by the terms of the NDA.

142. Tidal Vision acquired all of GenMax LLC's rights, title and obligations to USAG2020/GenMax and its product registration, including, upon information and belief, assumption of all contractual obligations and liabilities relating to the derivation and use of GenMax. As such, it is likewise bound by the terms of the NDA with respect to the use of the Confidential Information and the automatic vesting of all intellectual property and other property rights in Plaintiffs concerning any improvements, additions or creations relating to the Confidential Information.

143. Alternatively, Tidal Vision contracted with GenMax LLC for the acquisition of the GenMax product and associated rights under circumstances such that it knew or should have known that GenMax was derived from the unauthorized use of AGBio's Confidential Information, and that if AGBio had known of GenMax's existence, it would

claim (and now claims) ownership of GenMax, including all intellectual property, industrial property and proprietary rights in or relating to GenMax.

144. Following the initial registration of USAG2020, each of Vivid, GenMax LLC and Tidal Vision submitted to the EPA (a) proposed revisions to the product formula and manufacturing processes, and (b) alternative branding and trademarks (including but not limited to the "GenMax" product label) that constituted improvements, additions or creations relating to the Confidential Information.

145. Thus, the GenMax product, its formula, manufacturing processes, and all related data, as well as all associated and derivative brand names arising therefrom, are derived from, improvements on, additions or creations made from AGBio's Confidential Information. Such products/brand names include, *inter alia*, GenMax OS, Tidal Grow OS, GenMax ST, Tidal Grow ST, Tidal Grow Protech'd, Tidal Grow Cover, Tidal Grow Bloom, Tidal Grow GH, GenMax GH, Tidal Grow T&O, GenMax T&O, GenMax H&G, Tidal Grow H&G, GenMax HG, Tidal Grow HG, Tidal Grow Home, GenMax ST Next, GenMax OS Gold, and GenMax OS Ultra, Gen Max OS Next (collectively, the "GenMax Family").

146. Plaintiffs did not authorize any of Vivid's, GenMax LLC's, or Tidal Vision's submissions, Plaintiffs were not compensated for the use of the Confidential Information, and Plaintiffs were not credited with ownership of the intellectual property reflected in such submissions as provided for by Section 5 of the NDA.

147. Each such submission to the EPA and use of Plaintiffs' intellectual property constituted a separate breach of the NDA, entitling Plaintiffs to both monetary damages and equitable relief. *See* Exh. B at § 6.0.

148. Moreover, each of Vivid's, GenMax LLC's, and Tidal Vision's sales of GenMax to third parties and the retention of all revenues pertaining thereto, constituted separate breaches of the NDA, entitling Plaintiffs to both monetary damages and equitable relief. *Id.*

149. As a direct and proximate result of Vivid's, GenMax LLC's and Tidal Vision's past breaches of the NDA, Plaintiffs sustained damages in an amount to be determined at trial.

150. In addition, on a going-forward basis, there is a current case or controversy by and between Plaintiffs on the one hand, and Vivid, GenMax LLC and/or Tidal Vision on the other hand, in that Plaintiffs assert that (a) Vivid was an "associated" and/or "related" company to Agrichem and was bound to the terms of the NDA, (b) Vivid breached the NDA by, *inter alia*, using Confidential Information to register, sell, and file amendments to the USAG2020 registration, (c) as a result of USAG2020's derivation from the Confidential Information, all right, title and interest to GenMax and the GenMax Family automatically vested in AGBio (or, alternatively, BioAgro), (d) as successors to only those rights in GenMax and the GenMax Family as Vivid lawfully had, GenMax LLC and Tidal Vision are bound by the automatic vesting clause of the NDA, and, therefore (e) AGBio (or, alternatively, BioAgro) is entitled to a judgment recognizing its legal

ownership of the GenMax Family, including all proprietary, financial, and branding rights therein.

151. Upon information and belief, Vivid, GenMax LLC and/or Tidal Vision dispute(s) such claims.

152. Declaratory relief under 28 U.S.C. § 2201 will assist in resolving each of the legal issues described above regarding Plaintiffs' right, title and interest to the GenMax Family.

153. Plaintiffs have suffered and will continue to suffer immediate and irreparable injury if Vivid, GenMax LLC and/or Tidal Vision continue to assert an ownership interest in, manufacture, market, distribute and/or sell products in the GenMax Family in derogation of Plaintiffs' rights therein.

154. The harm to Plaintiffs is continuing in nature, such that an award of damages is inadequate to compensate it for all future loss of its right, title and interest in and to the GenMax Family.

155. No harm to the public interest would result from the granting of declaratory or injunctive relief. Indeed, the public interest would be served by the enforcement of Plaintiffs' proprietary rights.

156. Plaintiffs therefore request a judgment declaring that: (a) Vivid was an "associated" and/or "related" company to Agrichem and was bound to the terms of the NDA; (b) Vivid breached the NDA by, *inter alia*, using Confidential Information to register, sell, and file amendments to the USAG2020 registration; (c) all right, title and interest to GenMax and the GenMax Family automatically vested in AGBio (or,

alternatively, BioAgro); (d) GenMax LLC and Tidal Vision are bound by the automatic vesting clause of the NDA; and (e) AGBio (or, alternatively, BioAgro) is the lawful owner of the GenMax Family, including all proprietary, financial, and branding rights therein.

157. Plaintiffs further request the entry of a permanent injunction requiring Vivid, GenMax LLC and/or Tidal Vision to: (a) execute all documents necessary to establishing AGBio's/BioAgro's legal chain of title to the GenMax Family and all proprietary rights thereto (including but not limited to all trademarks and other intellectual property); (b) delivering to Plaintiffs all proceeds from all sales of products within the GenMax Family; (c) cease and desist from marketing, branding, or selling any product under the GenMax label or a GenMax Family label; and (d) cooperate with Plaintiffs in transferring the EPA Registration for GenMax and the GenMax Family to Plaintiffs.

158. The NDA contains a choice of law provision making it "governed by the laws of Queensland, Australia." Under Australian law, the prevailing party is entitled to an award of its attorneys' fees incurred in bringing the action.

WHEREFORE, as a result of the foregoing, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants Vivid, GenMax LLC, and Tidal Vision on Count III, enter an award against each of them for actual damages, declaratory and injunctive relief as described herein, attorneys' fees, costs, and post-judgment interest, and award Plaintiffs all such other relief to which the Court deems them justly entitled.

**COUNT IV**
**VIOLATIONS OF THE LANHAM ACT**
**15 U.S.C. § 1125(a)(1)**
**(Both Plaintiffs Against All Defendants)**

159. Plaintiffs incorporate by reference each of the foregoing paragraphs as if set forth in full herein.

160. 15 U.S.C. § 1125(a) provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

161. The "NuPro™" product name began being used in commerce in February 2016 and has continued to be marketed and sold under that name since that time.

162. As the nationwide distributor for NuPro™ beginning in April 2017, Vivid and Krenz marketed and sold NuPro™ to a growing and loyal base of American-based agricultural firms and customers.

163. As described herein, beginning in 2019, Vivid and Krenz embarked on a programmatic advertising and promotion campaign to steal AGBio's customers and potential customers by specifically targeting existing NuPro™ customers and marketing rebottled cannisters of NuPro™ with "GenMax" labels affixed thereto as "the new NuPro."

164. More specifically, Defendants Krenz, Vivid, and GenMax LLC willfully violated 15 U.S.C. § 1125(a)(1)(A)-(B) by knowingly marketing and selling GenMax with false and misleading off-label commercial statements such as "the new NuPro," the "new name for NuPro," that "NuPro is now GenMax," that GenMax "has replaced NuPro (same product, new name)" to customers, and other similar statements, in that such statements were likely to cause confusion, mistake, or deception and/or constituted misrepresentations of goods, services, or commercial activities in that they falsely suggested to existing and prospective NuPro™ customers that:

- GenMax was a direct replacement for NuPro™ rather than a competing product line;
- GenMax was produced or otherwise authorized by the same manufacturer as NuPro™;
- The product that Defendants were selling was in fact a new product rather than a rebottling and/or relabeling of already existing NuPro™;
- The product that Defendants were selling was of identical quality and efficacy to original NuPro™, when in fact, Defendants' rebottling of existing NuPro™ into alternate containers resulted in the degradation of the product as described herein; and

- The product they were purchasing, in the rebottled form in which they were purchasing it, *was* manufactured NuPro™ coming directly from the NuPro™ manufacturer.

165. These false statements were made in commerce affecting interstate trade, as Defendants marketed GenMax across the U.S. and NuPro™ has a national customer base.

166. Each of the Defendants further violated 15 U.S.C. § 1125(a)(1)(A)-(B) by marketing and selling, and continuing to market and sell, GenMax and/or the GenMax Family as Vivid's, GenMax LLC's and/or Tidal Vision's product when, in fact, ownership rights to all such products had automatically vested in Plaintiffs pursuant to § 5.0 of the NDA.

167. Plaintiffs each fall within the zone of interests protected by the Lanham Act and each suffered commercial injury proximately caused by Defendants' false statements. Plaintiffs seek Defendants' profits (including profits from the GenMax asset sale), Plaintiffs' damages, costs, and attorneys' fees under 15 U.S.C. § 1117(a).

168. As a result of Defendants' conduct, Plaintiffs have both suffered actual damages in the form of, *inter alia*, lost profits, market share, and goodwill that were directly and proximately caused by Defendants' false and misleading statements, which diverted customers from NuPro™ to GenMax.

WHEREFORE, as a result of the foregoing, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, on Count IV of the Complaint, enter an award against Defendants for Plaintiffs' actual damages, Defendants' profits, costs of the action, reasonable attorneys' fees, and post-judgment

interest, enter an injunction prohibiting Defendants from engaging in the conduct described herein, and award Plaintiffs all such other relief to which the Court deems them justly entitled.

**COUNT V**
**VIOLATIONS OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**MINN. STAT. § 325D.44**
**(Both Plaintiffs Against Tidal Vision)**

169. Plaintiffs incorporate by reference each of the foregoing paragraphs as if set forth in full herein.

170. Among other actions, the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA") makes it a deceptive trade practice for a person to, in the course of business, vocation, or occupation, to:

> (2) cause[] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3) cause[] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
>
> * * * * * * * * * *
>
> (13) engage[] in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices; or
>
> (14) engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

171. Tidal Vision has violated and continues to violate subsections (2), (3), (13) and (14) of Section 325D.44 of the MUDTPA by continuing to market and sell GenMax and/or the GenMax Family as Tidal Vision's product when, in fact, ownership rights to all such products have automatically vested in AGBio/BioAgro pursuant to § 5.0 of the NDA.

172. Plaintiffs are likely to be damaged by Tidal Vision's continued deceptive trade practices and therefore seek an injunction prohibiting Tidal Vision from continuing to market and sell GenMax and/or the GenMax Family as Tidal Vision's product.

WHEREFORE, as a result of the foregoing, Plaintiffs respectfully request that the Court enter judgment in their favor on Count V of the Complaint granting them an injunction as described herein and entering an award of their attorneys' fees, costs incurred, and all such other relief to which the Court deems them justly entitled.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC ADVANTAGE**
**(Both Plaintiffs Against Defendants Vivid, Krenz, GenMax LLC)**

173. Plaintiffs incorporate by reference each of the foregoing paragraphs as if set forth in full herein.

174. As described above, under the Letter of Intent and afterward, Vivid was the nationwide distributor of NuPro™ and sold NuPro™ to customers, and often repeat customers, under AGBio's label.

175. Moreover, Vivid and Krenz had been provided AGBio's confidential customer list pursuant to the NDA.

176. As such, both Plaintiffs had a reasonable expectation that such customers would continue purchasing NuPro™ for use as a low-dose chitosan seed treatment.

177. Defendants Vivid, Krenz, and GenMax LLC all knew that Plaintiffs had such an expectation of continued economic advantage, in that they knew and understood the utility of AGBio's product, that NuPro™ customers were likely to continue using NuPro™,

and that both AGBio (as owner of the NuPro™ product and Trade Secret technology) and BioAgro (as the exclusive manufacturer of NuPro™) had a direct economic interest in the continuation of the business relationship with such customers.

178. Defendants Vivid, Krenz, and GenMax LLC utilized AGBio's confidential customer list and marketed and sold GenMax as "the new NuPro," the "new name for NuPro," that "NuPro is now GenMax," that GenMax "has replaced NuPro (same product, new name)," and used similar marketing strategies. In doing so, Defendants Vivid, Krenz, and GenMax LLC intentionally interfered with Plaintiffs' reasonable expectation of economic advantage.

179. As described herein, such interference was independently wrongful or tortious and violated both the NDA and federal and state laws regulating the protection of intellectual property and deceptive trade practices (*i.e.*, Lanham Act, Minnesota Uniform Deceptive Trade Practices Act).

180. In the absence of such wrongful conduct, it is reasonably probable that Plaintiffs would have realized their continued economic advantage or benefit.

181. As a result of Defendants Vivid's, Krenz's, and GenMax LLC's wrongful conduct, Plaintiffs suffered damages in an amount to be determined at trial.

182. Defendants' conduct was willful, malicious, and in deliberate disregard for the rights of Plaintiffs.

WHEREFORE, as a result of the foregoing, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants Vivid, Krenz, and GenMax LLC, and each of them, on Count VI, enter an award against them jointly and severally for

actual damages, punitive damages, costs, and post-judgment interest, and award Plaintiffs all such other relief to which the Court deems them justly entitled.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated this 21st day of November, 2025.

Respectfully submitted,

MCN LAW LLC

By: /s/ *M. Cory Nelson*

M. Cory Nelson, MO # 63357 (*pro hac vice*)
8600 W. 110th Street, Suite 214
Overland Park, KS 66210
Telephone: (913) 358-5800
Email: mcorynelson@mcnlawllc.com

ATTORNEY FOR PLAINTIFFS

RGP Law Ltd.
Troy A. Poetz - 0318267
4140 Thielman Lane, Suite 110
P.O. Box 7456
Saint Cloud, MN 56302
Telephone: (320) 251-1055
Facsimile: (320) 251-5896
Email: troy@rgp.law

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

On this 21st day of November, 2025, a copy of the foregoing First Amended Complaint was electronically filed using the Court's ECF system, which will automatically send notice thereof to all counsel of record.

By: /s/ *M. Cory Nelson*
Attorney for Plaintiffs